DENISE KWASNY, Respondent-Appellant, v BEATRICE R. FEINBERG et al., Defendants, JOSEPH E. AMODEI, Respondent, and JOHN MEZZASALMA, Appellant-Respondent. (And a Third-Party Action.)

Second Department, June 11, 1990

### APPEARANCES OF COUNSEL

*Werner, Kennedy & French (John V. Henry* of counsel), for appellant-respondent.

*Benjamin J. Sergi, P. C. (Irving N. Selkin* of counsel), for respondent-appellant.

*Driscoll & Delaney (Denise B. Furiano* and *Barry K. Myrvold* of counsel), for defendant-respondent.

### OPINION OF THE COURT

Per Curiam.

On October 28, 1981, the plaintiff, who was 17 years old at the time, first sought chiropractic treatment from the defendant Dr. Amodei for low back pain of some three months' duration. Dr. Amodei did a thermogram, which showed no lumbar irritation, and he administered routine chiropractic manipulation. On her second visit on November 4, 1981, the plaintiff received the same treatments.

On November 28, 1981, the plaintiff fell down a flight of stairs at the shoe store where she worked, striking her lower back. After the fall, she consulted her family physician, Dr. DeGaetano, who referred her to Dr. Weiner for X rays.

On February 3, 1982, the plaintiff resumed chiropractic

treatment with Dr. Amodei, once again complaining of low back pain. On her first return visit, Dr. Amodei examined the X rays taken by Dr. Weiner, which revealed some narrowing of the disc spaces at L5-S1. Dr. Amodei thereafter treated the plaintiff until May 1982, and, after an interruption, from August 1982 until December 9, 1982. During these periods, the plaintiff told Dr. Amodei on more than one occasion that she was experiencing pain in her legs. The plaintiff stopped visiting Dr. Amodei on December 9, 1982, according to her because her condition was worsening, but by his account because she had improved and no longer needed treatment. The plaintiff saw Dr. Amodei on approximately 27 occasions.

In late December 1982 or early January 1983 the plaintiff suffered a coughing or sneezing episode, after which she experienced loss of vaginal, perineal and perianal sensation, as well as difficulty with urination and defecation. Because of severe accompanying lower back pain, the plaintiff tried to see Dr. Amodei, but he was out of town. Her father made an appointment for her with his own chiropractor, Dr. Mezzasalma.

The plaintiff, who was in extreme pain, visited and received chiropractic treatments from the defendant Dr. Mezzasalma on January 4, 5, 7, 8 and 12, 1983. The plaintiff and Dr. Mezzasalma differed as to whether or not she told him about her vaginal numbness and inability to urinate and defecate. On January 8, 1983, Dr. Mezzasalma approved the plaintiff's return to work.

On January 15, 1983, the plaintiff was seen on an emergency basis at Victory Memorial Hospital complaining of marked abdominal distention and fecal impaction for a week and a half. The bladder was relieved by catheterization, and the fecal impaction was removed digitally. Gluteal and perianal anesthesia was noted. Following a diagnosis of cauda equina syndrome, the plaintiff was transferred to Maimonides Medical Center, where, on January 16, 1983, an emergency myelogram was done showing a large central epidural defect at L5-S1, causing nerve root distortion. An emergency lumbar laminectomy was performed immediately afterwards, and a large, extruded, mid-line L5-S1 disc that was compressing the cauda equina was excised. Postoperatively, the plaintiff's severe back pain disappeared, but her urinary and fecal incontinence remained, and she was discharged from the hospital after 10 days on an intermittent catheterization regimen. At the trial, the plaintiff testified that to this day she suffers from

continuing low back pain, urinary incontinence requiring self-catheterization, bowel incontinence requiring daily digital removal of bowel contents, and perianal, perineal and vaginal anesthesia.

At the trial, the plaintiff's chiropractic expert and two neurosurgeons testified that both chiropractors had departed from good chiropractic practice, and that their treatments had contributed to the plaintiff's injuries in that they delayed proper surgical intervention and applied damaging rotary stress to the plaintiff's herniated lumbar disc. The defendants' experts, in contrast, testified that Drs. Amodei and Mezzasalma had adhered to good and accepted chiropractic standards, and that their treatments had not caused or contributed to the plaintiff's cauda equina syndrome.

Before the trial, the plaintiff entered into a structured settlement with the defendant Beatrice R. Feinberg, the owner of the building where the plaintiff fell on November 28, 1981. By the terms of that settlement, the plaintiff accepted $150,000, while an additional $125,000, was invested in an annuity, with the result that over 20 years the plaintiff would receive a total of $510,000. The court, in its charge, instructed the jury to apportion the fault of Feinberg and the two chiropractors, and the jury returned with a verdict in favor of the plaintiff of $500,000, with an apportionment of fault of 20% to Feinberg, 80% to Dr. Mezzasalma, and 0% to Dr. Amodei.

Dr. Mezzasalma claims that the plaintiff failed to establish a prima facie case against him. This contention is contradicted by the record. Having failed to object to the credentials of plaintiff's chiropractic expert, Dr. Weynman, Dr. Mezzasalma failed to preserve this issue for appellate review (see, Harris v Armstrong, 64 NY2d 700; Stern v Waldbaum, Inc., No. 10, 109 AD2d 789). In any event, the qualification of a witness as an expert is a determination within the sound discretion of the trial court (see, Meiselman v Crown Hgts. Hosp., 285 NY 389), and the court did not improvidently exercise its discretion in accepting Dr. Weynman as the plaintiff's chiropractic expert. The fact that he had been a practicing chiropractor for only five years, and the fact that his review of the plaintiff's records was purportedly "superficial" did not go to the admissibility of his testimony, but rather to its weight, which was properly evaluated by the jury (see, Coates v Peterson & Sons, 48 AD2d 890). Moreover, Dr. Weynman's testimony, as well as that of Dr. Mezzasalma's

own chiropractic expert, Dr. Krasner, supported the jury's conclusion that it was a departure from good chiropractic practice for Dr. Mezzasalma to have undertaken to treat the plaintiff when she presented herself at his office on January 4, 1983, in acute pain and apparently with neurological complaints *(see, Taormina v Goodman,* 63 AD2d 1018). In addition, evidence of proximate causation was supplied by neurosurgeon Dr. Jacobson, who testified that Dr. Mezzasalma had caused or contributed to the plaintiff's cauda equina syndrome by failing to refer her for medical attention and by placing rotary stress on her damaged disc *(see, Torro v Altman,* 97 AD2d 819).

Dr. Mezzasalma further alleges that the judgment against him was fully satisfied by the plaintiff's settlement with the defendant Feinberg, because Feinberg's total payout of $510,000 over 20 years should be deducted from the judgment against him, as well as because Feinberg's settlement encompasses both the "initial injuries" caused by her negligence and the "aggravation of injuries" caused by foreseeable malpractice. General Obligations Law § 15-108 (a) provides that when a release is given to a settling tort-feasor, "it does not discharge any of the other tortfeasors from liability for the [plaintiff's] injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest". The release given by the plaintiff to the settling defendant Feinberg did not by its terms discharge any other tort-feasors from liability for her injuries *(see, Utter v South Brookhaven Obstetric & Gynecologic Assocs.,* 135 AD2d 811), and it declared by its terms that the defendant Feinberg was released in consideration of the sum of $275,000. The fact that part of this sum was to be invested in an annuity so that the plaintiff would ultimately receive the sum of $510,000 over 20 years may not inure to the benefit of Dr. Mezzasalma, any more than he would have been entitled to a setoff for interest accrued had the plaintiff taken her $275,000 in cash and placed it in a savings account *(cf., Reinitz v Arc Elec. Constr. Co.,* 104 AD2d 247).

There is similarly no merit to the plaintiff's contention on her cross appeal that Dr. Mezzasalma is entitled to no setoff because he neglected to move for leave to amend his

answer to include the settlement as an affirmative defense pursuant to CPLR 3018 (b). Leave to amend pleadings is freely given, and in a case like the one at bar, where there would have been no surprise to the plaintiff, and no issue as to the validity of the settlement *(see, Hill v St. Clare's Hosp.,* 67 NY2d 72, 83-84), Dr. Mezzasalma was entitled to amendment of his answer to include the defense of settlement *(see, Manginaro v Nassau County Med. Center,* 123 AD2d 842).

■ Further, the setoff approved of by the court is appropriate. The jury found that the plaintiff should be compensated in the amount of $500,000, for which the defendant Feinberg was 20% responsible and Dr. Mezzasalma was 80% liable. Because the defendant Feinberg had already paid $175,000 more than her equitable share, that amount was deducted from the $400,000 owed by Dr. Mezzasalma. Moreover, according to the record, this is not a case of "original" and "successive" tort-feasors, wherein a settling "original" tort-feasor may be presumed to have compensated the plaintiff for both initial and "aggravated" injuries caused by her precipitating negligence. Rather, it would appear that the plaintiff had an underlying degenerative condition which, as the jury found, was worsened to the point of her current injuries in the amount of 20% by the defendant Feinberg and 80% by Dr. Mezzasalma. In consequence, a hearing pursuant to CPLR 4533-b, to deduct from the plaintiff's award the amount of Feinberg's settlement earmarked for "aggravation" of injuries, is not required under the circumstances *(cf., Hill v St. Clare's Hosp., supra).*

■ Dr. Mezzasalma also contends that he was prejudiced by the plaintiff's counsel's remarks on summation. We find that the comments objected to, when read in context, were within the bounds of the wide latitude allowed to counsel on summation, and that, in any event, any possible prejudice was corrected by the court's curative instructions during its charge *(see, Heberer v Nassau Hosp.,* 119 AD2d 729; *Kusisto v McLean,* 52 AD2d 674).

■ The plaintiff's contention on her cross appeal that the verdict in favor of the defendant Dr. Amodei was against the weight of the evidence is unsupported by the record. "A verdict in favor of a defendant should not be set aside as against the weight of the credible evidence unless the preponderance in favor of the plaintiff was so great that the finding in favor of the defendant could not have been reached upon any fair interpretation of the evidence" *(Olsen v Chase Man-*

*hattan Bank,* 10 AD2d 539, 544, *affd* 9 NY2d 829; *Rossetti v Campanella,* 118 AD2d 552; *Nicastro v Park,* 113 AD2d 129). There was sharply conflicting testimony as to whether or not Dr. Amodei's treatments contributed to the plaintiff's injuries. However, the jury's verdict is supported by a fair interpretation of the evidence, and should not be set aside *(see, Emmons v Country Lincoln Mercury Sales,* 111 AD2d 213). We note that a fair interpretation of the plaintiff's own testimony, coupled with that of Dr. Amodei's chiropractic expert, Dr. Goldschmidt, and that of the plaintiff's surgeon, Dr. Anant, could have led the jury to the rational conclusion that Dr. Amodei had not departed from good chiropractic practice in treating the plaintiff, and that Dr. Amodei had had no indication that the plaintiff was suffering from a herniated disc, since no such symptoms appeared until several weeks after Dr. Amodei last treated her.

■ We conclude that the jury's award to the plaintiff of $500,000 for pain and suffering is not inadequate, as it is not "so disproportionate to the injury as to not be within reasonable bounds" *(Riddle v Memorial Hosp.,* 43 AD2d 750, 751), nor does it shock the conscience of the court *(see, Knight v Long Is. Coll. Hosp.,* 106 AD2d 371, 372).

Accordingly, the judgment and the order are affirmed, without costs or disbursements.

THOMPSON, J. P., KUNZEMAN, HARWOOD and MILLER, JJ., concur.

Ordered that the judgment and the order are affirmed, without costs or disbursements.