Debbie BRODERSEN, Individually and as Executrix of the Estate of Kendall E. Brodersen, Plaintiff,

v.

SIOUX VALLEY MEMORIAL HOSPI-TAL, Frank Allender, D.C.; Stephen Veit, M.D.; Stephen Veit, M.D., P.C.; Thomas Gary, M.D. and T.M. Gary, M.D., P.C., Defendants.

No. C 93–4011.

United States District Court, N.D. Iowa, Western Division.

Sept. 19, 1995.

Roxanne B. Conlin and Donna Laddy of Roxanne Conlin & Associates, P.C., Des Moines, Iowa, for plaintiff.

Edwin Evans of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, for defendant Sioux Valley Memorial Hospital.

Joseph L. Fitzgibbons of Fitzgibbons Brothers, Estherville, Iowa, and Mark R. Cozine of Martin, Wibe & Cozine, Cherokee, Iowa, for defendants Stephen Veit, M.D., Gene Michel, M.D. and Stephen Veit, M.D., P.C.

Maurice Nieland, Sioux City, Iowa, for defendants Thomas Gary, M.D., and T.M. Gary, M.D., P.C.

Michael R. Hellige of Shull, Cosgrove, Hellige, Du Bray & Lundberg, Sioux City, Iowa, for defendant Frank Allender, D.C.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .934
II. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .935
   A. Uncontested Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .935
   B. Contested Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .936
III. STANDARDS FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .936
IV. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .938
   A. The Hospital's Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . .938
      1. The History and Purpose of the EMTALA . . . . . . . . . . . . . . . . . . . . . . . . . .938
      2. EMTALA Standards for a Claim under 42 U.S.C. § 1395dd(a) . . . . . . . .940
         a. Treatment or Appropriate Medical Screening . . . . . . . . . . . . . . . . 940
         b. Failure to Stabilize Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 943
         c. Failure to Provide Emergency Medical Care Because of Improper Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 945
           i. The Split In Authority On Requiring Economic Motive to Be Shown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .946
           ii. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .948
   B. Defendant Allender's Motion for Summary Judgment . . . . . . . . . . . . . . . . . . .950
   C. Defendant Allender's Third Motion for Summary Judgment and For Ruling Under Federal Rule of Evidence 104(a) . . . . . . . . . . . . . . . . . . . . . . . .950
V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .956

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

BENNETT, District Judge.

This lawsuit arises out of the medical treatment the decedent Kendall E. Brodersen ("Kendall") received or failed to receive from Defendants, a hospital, a chiropractor, and two physicians, in the days prior to his death on January 27, 1991. At issue in these pending motions for summary judgment are allegations in Plaintiff's complaint, *inter alia*, that Defendant Sioux Valley Memorial Hospital ("the Hospital") violated the federal Emergency Medical Treatment and Active Labor Act ("EMTALA") by failing to provide Kendall with appropriate medical screening, and by failing to stabilize Kendall's condition before discharging him. The Hospital has moved for summary judgment on Plaintiff's EMTALA claims. The Hospital's motion on Plaintiff's screening claim requires the court to determine if a material question of fact has been generated on the issue of whether the Hospital provided Kendall with treatment which deviated from the Hospital's standard procedures for similarly situated patients.

Plaintiff further alleges a state law negligence claim against Defendant Frank Allender, a chiropractor who treated Kendall in the days before his death. Allender has filed two motions for summary judgment. One motion raises the question of whether the court has subject matter jurisdiction over

him if the Hospital's motion for summary judgment is granted. Allender's second motion for summary judgment challenges whether Plaintiff is able to establish a material fact question regarding a violation of the applicable standard of care by Allender.

## I. INTRODUCTION AND BACKGROUND

Plaintiff Debbie Brodersen ("Brodersen"), on behalf of herself and as executrix of Kendall Brodersen's estate, filed her complaint against Defendants on February 17, 1993. First, in count I of the complaint, Brodersen alleges a violation of the EMTALA by the Hospital. Count II of the complaint contains a state law negligence claim against the Hospital. In count III, Brodersen alleges a negligence claim against Defendant Frank Allender. Count IV alleges negligence against Defendants Stephen Veit and Thomas Gary, treating physicians, in both their individual and corporate capacity. The second division of the complaint alleges loss of consortium by Plaintiff Debbie Brodersen.

The Hospital has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) on each of Brodersen's claims against it.[1] The Hospital asserts that no genuine dispute exists as to the fact that Kendall Brodersen received an "appropriate" medical screening examination within the capability of the Hospital's emergency department, see 42 U.S.C. § 1395dd(A). The Hospital asserts that it provided Kendall with treatment which did not in any way deviate from the Hospital's standard procedures for similarly situated patients. It further asserts that, because of the symptoms presented by Kendall, the protocols at the Hospital regarding the conducting of EKGs and the placement of patients in the Hospital's cardiac unit were both followed in this instance. The Hospital also asserts that no genuine dispute exists as to the fact that Kendall did not have an "emergency medical condition"

at the time he was hospitalized and, even if he did, his condition was "stabilized" at the time of his discharge, see 42 U.S.C. § 1395dd(c)(1)(A)(ii). Additionally, the Hospital contends that Brodersen is unable to meet a second requirement under EMTALA, demonstrating that the disparate treatment Kendall received was the result of an economic motive on the part of the Hospital. Finally, the Hospital contends that, once the EMTALA claim is dismissed, Plaintiff's remaining pendent claims should likewise be dismissed.

Defendant Frank Allender has also filed two motions for summary judgment. In the first, he asserts that the Hospital's motion for summary judgment is meritorious and therefore the court does not have subject matter jurisdiction over him pursuant to 42 U.S.C. § 1395.[2] He further asserts that the court should not exercise supplemental jurisdiction over him under 28 U.S.C. § 1367. In his "third" motion for summary judgment, Allender contends that Brodersen's evidence cannot, as a matter of law, establish a violation of the applicable standard of care because none of Brodersen's experts are qualified to testify as to the standard of care for a chiropractor and that, because Brodersen does not have a qualified expert, she can establish neither the standard of care nor a violation of it.

A hearing on Defendants' motions for summary judgment was held on September 5, 1995. At the hearing Plaintiff was represented by Roxanne B. Conlin and Donna Laddy of Roxanne Conlin & Associates, P.C., Des Moines, Iowa. Defendant Sioux Valley Memorial Hospital was represented by Edwin Evans of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota. Defendants Stephen Veit, M.D., Gene Michel, M.D., and Stephen Veit, M.D., P.C. were represented by Joseph L. Fitzgibbons of Fitzgibbons Brothers, Estherville, Iowa, and Mark R. Cozine of Martin, Wibe & Cozine,

---

1. Defendants Thomas Gary, M.D., and T.M. Gary, M.D., P.C. have joined the Hospital's Motion for Summary Judgment. Although Brodersen's EMTALA claim is inapplicable to them, these Defendants contend that once the EMTALA claim against the Hospital is dismissed, Plaintiff's remaining pendent claims, including all of Brodersen's claims against them, should likewise

be dismissed because the court does not have subject matter jurisdiction over them.

2. This motion is entitled Frank Allender's First Motion for Summary Judgment (# 82). His subsequently filed motion for summary judgment is entitled Defendant Frank Allender's Third Motion for Summary Judgment.

Cherokee, Iowa. Defendants Thomas Gary, M.D., and T.M. Gary, M.D., P.C., were represented by Maurice Nieland of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, Sioux City, Iowa. Defendant Frank Allender, D.C., was represented by Michael R. Hellige of Shull, Cosgrove, Hellige, Du Bray & Lundberg, Sioux City, Iowa. The parties have filed thorough and extensive briefs in support of their respective positions. Counsel were exceptionally well prepared for oral argument. The oral arguments were unusually spirited and reflected the hotly contested nature of this litigation. This matter is now deemed fully submitted.

## II. FINDINGS OF FACT

### A. Uncontested Facts

For the purposes of this summary judgement motion only, the court finds the following facts:

The record reveals that the following facts are undisputed. Kendall Brodersen worked on Thursday, January 24, 1991. That evening, Brodersen complained to his wife, Debbie Brodersen, about suffering both back and chest pain. Kendall told Debbie to contact a chiropractor regarding treatment. Debbie arranged for Kendall to be seen by Defendant Frank Allender, D.C., that evening. Allender examined Kendall the evening of January 24, 1991. Kendall reported that he was suffering from upper and middle back pain, neck pain, chest pain, sore throat and headaches in the temple area. Kendall indicated that, at approximately 4:30 p.m., someone at work had grabbed him about his neck and pulled him backwards, and that he had begun to have pain at 6:00 p.m. that evening.

Kendall returned to Dr. Allender the next day, January 25, 1991. On Saturday, January 26, 1991, Kendall saw both Dr. Allender and Defendant Stephen Veit, M.D., a general practitioner in Cherokee, Iowa. Kendall informed Veit that he had been coughing up bloody phlegm for two days, was nauseous, and had pain when breathing in deeply. At the time of his examination by Dr. Veit, Kendall had normal blood pressure levels, but had a slightly elevated temperature. Dr. Veit's diagnosis was that Kendall had a bronchial infection. Dr. Veit prescribed Augmentin for Kendall.

Kendall's condition did not improve during January 26, 1991, and in the early morning hours of January 27, 1991, Debbie called Dr. Veit and informed him that Kendall's condition had not improved and that he had vomited the Augmentin. Dr. Veit instructed Debbie to let Kendall rest his stomach and then have him take another dose of the Augmentin. If Kendall was unable to keep the Augmentin down, then she was told to take Kendall to an emergency room.

Kendall and Debbie arrived at the Hospital's emergency room at 3:50 a.m. on January 27, 1991. Kendall had health insurance through Blue Cross and Blue Shield. Bonnie Weise, a nurse, was in charge of the Hospital's emergency room on the morning of January 27, 1991. Kendall complained of back and chest pain, nausea, spitting up blood, and that he had been unable to eat anything for two days. He also reported that he had seen Dr. Veit the day before and that Dr. Veit had told him to go to the emergency room that evening if his condition did not improve.

Weise conducted an examination of Kendall. Kendall had a low grade fever of 99.9, he was not coughing and his lungs sounded clear when listened to with a stethoscope. The Hospital does not have an emergency room physician on site at all times. Rather, the Hospital has a physician who is on call. She called the on call physician that evening, Defendant Thomas Gary, M.D., and spoke with him concerning Kendall's condition. Weise did not consider Kendall to be in acute distress. Dr. Gary instructed Weise to have Kendall return at 7:30 for an x-ray. No electrocardiogram ("EKG") was performed on Kendall at this time. The Hospital has a written policy regarding EKGs on emergency room patients which states:

> Patients presenting to Emergency Room with chest pain are to have an EKG simultaneous to the physician being notified. This EKG is ordered at the discretion of the Patient Care Coordinator's evaluation of the patient.

Plaintiff's Ex. 16. Weise informed the Brodersens of Dr. Gary's instructions, and they left the emergency room at 4:15 a.m.

The Brodersens returned to the Hospital's emergency room at 7:08 a.m. on January 27, 1991. Dr. Gary was still the doctor on call. Kendall still had complaints about coughing up blood, difficulty breathing and chest pain. Kendall was examined and a chest x-ray was taken. Dr. Gary diagnosed Kendall with bilateral pneumonia and admitted him to the Hospital. Dr. Gary ordered that antibiotics, oxygen and IV fluids be administered to Kendall. He also ordered some lab work. Kendall remained hospitalized through the day.

Nurses informed Dr. Gary of Kendall's condition throughout the day. Dr. Gary saw Kendall at 6:15 p.m. At this time, Nurse Barrie Black informed Dr. Gary of Kendall's low oxygen saturation, his pulse rate and that Kendall was growing more anxious. Dr. Gary prescribed Valium for Kendall, spoke to the Brodersens, and then left. At 6:30 p.m. Kendall went into cardiac arrest. At 9:30 p.m., Kendall was transferred by air ambulance to Marian Health Center in Sioux City, Iowa. Kendall went into cardiac arrest again while being air lifted. He died at approximately 10:40 p.m. on January 27, 1991.

An autopsy was conducted by Dr. Thomas Bennett. Dr. Bennett diagnosed the cause of Kendall's death as acute myocardial infarction due to the right coronary artery thrombosis which was due to atherosclerotic coronary artery disease. Dr. Bennett opined that the myocardial infarction occurred three to five days prior to Kendall's death.

### B. Contested Facts

1. Is it standard policy at the Hospital to conduct an EKG on a patient who presents with chest pain?

2. Is it standard policy at the Hospital to place a patient suffering from chest pains in the Hospital's cardiac unit?

3. Did the staff at the Hospital consider or believe that Kendall was a Title XIX patient at any time while he was being treated at the Hospital?

4. Did the staff of the Hospital know that Kendall Brodersen was suffering from an emergency medical condition at the time of his release on January 27, 1991?

### III. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. ... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed.R.Civ.P. 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Mi-*

*chael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[3] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Brodersen, and give Brodersen the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving parties, Defendants, bear "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). Defendants are not required by Rule 56 to support their motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Brodersen is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir. 1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994).

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If Brodersen fails to make a sufficient show-

---

**3.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

ing of an essential element of a claim with respect to which she has the burden of proof, then Defendants are "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the Defendants' motions for summary judgment.

## IV. LEGAL ANALYSIS

### A. The Hospital's Motion for Summary Judgment

Brodersen has brought a claim against the Hospital under the EMTALA, 42 U.S.C. § 1395dd. The EMTALA states in relevant part:

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, *the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department,* including ancillary services routinely available to the emergency depart-

4. Section 1395dd(d)(2)(A) permits a personal right of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section." 42 U.S.C. § 1395dd(2)(A).

5. "Emergency medical condition" is defined as follows:

(1) The term "emergency medical condition" ' means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
    (A) placing the patient's health in serious jeopardy,
    (B) serious impairment to bodily functions, or
    (C) serious dysfunction of any bodily organ or part.
42 U.S.C. § 1395dd(e)(1).

ment, to determine whether or not an emergency medical condition ... exists. 42 U.S.C. § 1395dd(a).[4] The Hospital asserts in its motion for summary judgment that Brodersen is unable to demonstrate that the Hospital violated the EMTALA by either failing to provide Kendall Brodersen with appropriate medical screening or failing to stabilize Kendall's condition. After discussing the history and purpose behind the EMTALA, the court will then discuss each of Brodersen's claims *seriatim.*

### 1. The History and Purpose of the EMTALA

President Reagan signed the Comprehensive Omnibus Budget Reconciliation Act of 1986 ("COBRA") into law on April 7, 1986. EMTALA was part of COBRA. EMTALA requires that hospitals having emergency departments and which participate in the Medicare program provide a medical examination within the capability of the hospital's emergency department to any person requesting one. The examination's purpose is to determine whether the person is suffering from an "emergency medical condition" as that term is defined under EMTALA.[5] An individual found to be in an emergency medical condition must either be provided with medical treatment or transferred in accordance with EMTALA. *See* 42 U.S.C. § 1395dd(b)(1). A person in an emergency medical condition may be transferred without restriction once stabilized.[6] If the patient has not been stabi-

6. EMTALA contains parallel, but separate, definitions of the terms "to stabilize" and "stabilized." The term "to stabilize" indicates what the hospital must do to a patient in an emergency condition who is not transferred in accordance with subsection (c). "Stabilized" refers to the condition the patient must be in to transfer him other than in accordance with the restrictions of subsection (c). The terms are defined as follows:

(4)(A) The term "to stabilize" means, with respect to an emergency medical condition, to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from the transfer of the individual from a facility.
(B) The term "stabilized" means, with respect to an emergency medical condition, that no material deterioration of the condition is likely, within reasonable medical probability, to result

lized, however, a hospital is not permitted to transfer that patient except for medical reasons. *See* 42 U.S.C. § 1395dd(c)(1)(A)(ii).[7]

■ EMTALA, commonly known as the "Patient Anti–Dumping Act," was enacted "in response to a growing concern about 'the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured.'" H.R.Rep. No. 241 (III), 99th Cong., 1st Sess. 5, reprinted in 1986 U.S.C.C.A.N., 42, 726–27. EMTALA's anti-dumping provisions took effect August 1, 1986. "The statute was designed principally to address the problem of 'patient dumping,' whereby hospi-

tal emergency rooms deny uninsured patients the same treatment provided paying patients, either by refusing care outright or by transferring uninsured patients to other facilities."[8] *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir.1991); *see Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir.1990); *see generally* Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U.L.Rev. 1186, 1187–88 (1986). Congress was concerned that hospitals were abandoning their longstanding practice of providing emergency care to all as a cost cutting measure.[9] *Brooks v. Mary-*

---

from the transfer of the individual from a facility.

42 U.S.C. §§ 1395dd(e)(4)(A)–(B).

7. 42 U.S.C. § 1395dd(c)(1)(A)(ii) requires that a physician or other qualified medical person sign a certification which states:

based upon the reasonable risks and benefits to the patient, and based upon the information available at the time, the medical benefits reasonably expected from the provision of [care at another facility] outweigh the increased risks the [transfer poses to the person's condition].…

8. Examples of the dangers to patients from the dumping practices employed by hospitals was detailed in a summary report of a House of Representatives' subcommittee investigating patient dumping:

In Contra Costa County, Eugene Barnes was a crime victim with a knife wound to the brain. No neurosurgeon would agree to come to any of the East Bay hospitals to treat him. After several hours, he was transferred to the county hospital in San Francisco, where he died. Mr. Barnes had no health insurance.

About to deliver, Sharon Ford was turned away from two private hospitals, although a fetal monitor showed fetal distress. By the time she was admitted to the country [sic] hospital, it was too late and the baby died. Although Ms. Ford was a Medical patient enrolled in a health maintenance organization, a computer error did not show her on its list. The hospitals, by mistake, thought she was uninsured.

William Jenness bled to death 6½ hours after a car accident in Stanislaus County. The private hospital where he was taken asked for a $1,000 advance deposit. Because he couldn't pay, he was transferred to the county hospital where it took 4 hours before he reached the operating room, Mr. Jenness was uninsured.

In labor and uninsured, Anna Grant went to a private hospital. The hospital kept her in a wheelchair in their lobby for 2 hours and 15

minutes. She was checked only once, and no tests were done which would have shown that the fetus was in profound distress. She was told to "get herself" ' to the county hospital. The transferring hospital misrepresented her condition to the county hospital via phone. The baby was later stillborn at the county hospital, where doctors spent 40 minutes in an attempted resuscitation.

David Rios was critically wounded with two gunshot wounds and was brought to a private hospital in Ventura County. One hour and fifteen minutes later, he was received in a medically unstable condition and in shock at the county hospital. He died later that night. Mr. Rios was uninsured. The private hospital had claimed he was stable when he was transferred.

William Trumbull sought treatment for chest pain and an unexplained shortness of breath. He died of a massive blood clot in his lung, after being discharged by a private hospital in Hayward. The hospital had not done the basic diagnostic test that would have uncovered the treatable cause of his breathing problem. Mr. Trumbull, employed as a truck driver, had no health insurance.

Equal Access to Health Care: Patient Dumping: Subcomm. on Human Resources and Intergovernmental Relations to the House Comm. on Government Operations, H.R.REP. No. 531, 100th Cong., 2d Sess., at 6–7 (1988).

9. The House Committee on Ways and Means reported as follows:

The Committee is greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance. The Committee wants to provide a strong assurance that pressures for greater hospital efficiency are not to be construed as license to ignore traditional responsibilities and loosen historic standards.

H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27, reprinted in 1986 U.S.C.C.A.N., 42, 605. Similarly, the House Judiciary Committee noted:

*land Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir.1993). In response, Congress enacted EMTALA with its requirements that hospitals conduct a medical screening and provide stabilizing treatment to any patient seeking care in a hospital emergency room.[10] *See Gatewood*, 933 F.2d at 1039. Thus, EMTALA was not designed to provide a federal remedy for misdiagnosis or general malpractice. *See Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994) ("[N]o federal malpractice claims are created."); *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) (EMTALA's "purpose.... was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care."); *Gatewood*, 933 F.2d at 1039 ("[A]n 'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures."); *see also Williams*, 34 F.3d at 697 (holding that correct interpretation of "appropriate medical screening" to "mean uniform treatment rather than correct diagnosis : ...."); *Collins v. DePaul Hosp.*, 963 F.2d 303, 307 (10th Cir.1992) (quoting language in *Gatewood* that section 1395dd(a) was not intended " 'to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances.' ").

> In recent years there has been a growing concern about the provision of adequate emergency room services to individuals who seek care, particularly as to the indigent and uninsured. Although at least 22 states have enacted statutes or issued regulations requiring the provision of limited medical services whenever an emergency situation exists, and despite the fact that many state court rulings impose a common law duty on doctors and hospitals to provide necessary emergency care, some are convinced that the problem needs to be addressed by federal sanctions.... The Judiciary Committee shares the concern of The Ways and Means Committee that appropriate emergency room care be provided to patients faced with medical emergencies and active labor. H.R.Rep. No. 241(III), 99th Cong., 1st Sess. 5, 6, reprinted in 1986 U.S.C.C.A.N., 42, 726–727.

**10.** Under the common law, hospitals were under no legal duty to provide treat patients. *Brooks*, 996 F.2d at 710 (noting that under "traditional state tort law" hospitals were under no duty to provide emergency care); *Birmingham Baptist*

**2. EMTALA Standards for a Claim under 42 U.S.C. § 1395dd(a)**

**a. Treatment or Appropriate Medical Screening**

■ The court now turns to the standards applicable to Brodersen's EMTALA claims. Under 42 U.S.C. § 1395dd(a), those hospitals with an emergency medical department must provide an appropriate medical screening to determine whether an emergency medical condition exists for any individual who comes to the emergency medical department requesting treatment.[11] *See Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir.1994); *Brooks*, 996 F.2d at 710.

As the court has previously noted, EMTALA is not a federal malpractice statute. *See Brooks*, 996 F.2d at 710–711; *Baber*, 977 F.2d at 880; *Gatewood*, 933 F.2d at 1039. Instead, EMTALA requires a hospital's emergency room to screen all patients with the same level of treatment which that hospital would normally provide to patients in similar medical circumstances, and to stabilize any emergency condition discovered. *See Williams*, 34 F.3d at 697; *Brooks*, 996 F.2d at 711; *Baber*, 977 F.2d at 880; *Gatewood*, 933 F.2d at 1039; *see also Cleland*, 917 F.2d at 272 ("If [the hospital] acts in the same manner as it would have for the usual

*Hosp. v. Crews*, 229 Ala. 398, 399, 157 So. 224, 225 (1934) (holding that private hospital does not have duty to treat patient it deems unacceptable and need not give reason for its refusal of treatment); *Hurley v. Eddingfield*, 156 Ind. 416, 59 N.E. 1058, 1058 (1901) (concluding that although defendant was only available physician, he was free to refuse treatment). The general absence of a duty to give aid flows from the traditional common law distinction between nonfeasance and misfeasance. Liability is imposed for intentional or negligent misfeasance but not for nonfeasance or failure to act, unless there is a special relationship between the parties, such as parent and child. *See* W. Prosser, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 56, at 373–75 (5th ed. 1984).

**11.** "The term 'participating hospital' means [a] hospital that has entered into a provider agreement under section 1395cc." 42 U.S.C. § 1395dd(e)(2). The Hospital does not contest that it is a participating hospital within the meaning of the Act.

paying patient, then the screening provided is 'appropriate' within the meaning of the statute."). Thus, under *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552–53, summary judgment is proper here if Brodersen fails to show that the Hospital treated Kendall differently from other similarly situated patients. *Williams,* 34 F.3d at 697 (citing *Gatewood,* 933 F.2d at 1041).

■ Here, the Hospital has presented the affidavit of Dr. Gary, who avers that:

9. To the best of my knowledge, the medical screening procedure at the time of the 3:50 a.m. 1–27–91 admission was performed in accordance with standard operating policy at the hospital for treatment of patients with the same or similar symptoms. Furthermore, to the best of this Affiant's knowledge, all hospital protocols and procedures applicable to screening examinations of patients in the same or similar circumstances as Mr. Brodersen's presentation at the emergency room were, in fact, followed.

10. To the best of this Affiant's knowledge and belief, Mr. Brodersen received the same standard medical screening examination as other patients presenting with similar complaints and symptoms under the same or similar circumstances.

Gary Aff. at ¶¶ 9–10. In addition, the Hospital has presented the affidavits of nurses Bonnie Weise and Karen Rupp.[12] Rupp, the Hospital's nurse manager for the emergency room, states in her affidavit that:

3. I have now had an opportunity to review the entire chart of Kendall Brodersen and am familiar with the care and treatment provided to Mr. Brodersen at the time of his emergency room admission at 3:50 a.m., 1–27–91.

4. Based upon my review of the chart, as well as my knowledge of the general policies and procedures at the hospital for emergency room care, Mr. Brodersen was accorded the same medical screening examination as other patients reporting the same or similar symptoms under the same or similar circumstances.

5. Based upon my review of the medical records, as well as my knowledge of hospital protocols and procedures, the medical screening procedure accorded Mr. Brodersen at about 3:50 a.m., on 1–27–91, was in accord with standard hospital policy and procedure utilized for other similarly situated patients.

Rupp aff. at ¶¶ 3–5.

The court concludes that the Hospital, as the moving party has met its "initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed,* 7 F.3d at 810. Thus, Brodersen is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *see Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

In response, Brodersen has presented the affidavits of two nurses who were employed by the Hospital at the time Kendall was treated there on January 27, 1991, Lorna Jahde and Janet Kohn.[13] Jahde avers, in pertinent part, in her affidavit that:

similar circumstances as Mr. Brodersen's presentation at the emergency room were, in fact, followed.

10. To the best of this Affiant's knowledge and belief, Mr. Brodersen received the same standard medical screening examination as other patients presenting with similar complaints and symptoms under the same or similar circumstances.

Weise Aff. at ¶¶ 9–10.

---

12. Paragraphs nine and ten of Bonnie Weise's affidavit are identical to those found in Dr. Gary's affidavit. Weise avers that:

9. To the best of my knowledge, the medical screening procedure at the time of the 3:50 a.m. 1–27–91 admission was performed in accordance with standard operating policy at the hospital for treatment of patients with the same or similar symptoms. Furthermore, to the best of this Affiant's knowledge, all hospital protocols and procedures applicable to screening examinations of patients in the same or

13. Jahde was discharged from the Hospital in 1992.

7. When I first arrived at work on January 27, 1991, at approximately 2:15 p.m., I was told that there was a very sick patient on the floor who had chest pains.

8. I asked, "Why isn't [this patient] in the [cardiac] unit?" I was told that the sick patient Kendall Brodersen, was a Title XIX patient—a person who does not have his own medical insurance but for whom the state pays medical and hospital expenses—with a history of drug abuse.

9. Throughout the afternoon, I observed Mr. Brodersen's condition deteriorate. I was not assigned to act as Mr. Brodersen's nurse, but I could see Mr. Brodersen clearly whenever I walked back and forth between the nurse's station and my patients' rooms.

10. I observed that Mr. Brodersen suffered from classic signs of heart failure. In addition to suffering from chest pains, he had difficulty breathing, he was ashen, and he was not alert. I understand that the hospital chart and assessment records show that the recording nurse noted that Mr. Brodersen denied that he had any chest pains. Contrary to this notation, I observed Mr. Brodersen complain of terrible chest pains repeatedly. Both Mr. Brodersen and Ms. Brodersen expressed the fact that Mr. Brodersen was experiencing chest pains.

Jahde aff. at ¶¶ 7–10. In her supplemental affidavit, Jahde states that it was Barrie Black, Kendall's primary nurse, who informed her that Kendall was a Title XIX patient with a history of drug use. Jahde supplemental aff. at ¶¶ 18–19. Kohn was working the 6:30 p.m. to 7:00 a.m. shift on January 27, 1991. She states, in pertinent part, in her affidavit that:

6. On January 27, 1991, I first learned that Kendall Brodersen, who was distantly related to me by marriage, was in the hospital after his code status was announced. When a code is in progress, it means that a patient is not breathing on his own or has no pulse.

7. Upon learning that Kendall Brodersen's condition reached code status, I went to Kendall Brodersen's room.

8. When I arrived at Kendall Brodersen's room, Dr. Gary was not there. I was told that Barrie Black, Kendall Brodersen's primary nurse, had been calling Dr. Gary all day trying to get him to come to the hospital. Throughout the day Barrie Black had called Dr. Gary frequently about the deterioration of Kendall Brodersen's condition. Usually, a doctor who has been called and advised about a patient's deteriorating health status as many times as Barrie Black called Dr. Gary that day, will come in to the hospital to see the patient.

Kohn Aff. at ¶¶ 6–8. Kohn further avers in her affidavit that shortly after Kendall was air transferred Dr. Gary took all of Kendall's hospital records from the nursing station. After taking the records, the Hospital's light system indicated that Dr. Gary was no longer on the Hospital's premises. Finally, Brodersen points out that Kendall was not administered an EKG even though he had complaints of chest pain. Such action would be in apparent contravention of the Hospital's EKG policy. Indeed, in his affidavit, Dr. Phillips avers:

10. I have reviewed 48 summary sheets for patients who were provided with EKGs by Sioux Valley Hospital from June 1, 1991 [sic] to February 1, 1991. In each instance, based on the history provided, the patients had symptoms medically identical to those of Kendall Brodersen, similar to Kendall Brodersen's in medically significant ways, or even less serious than Kendall Brodersen's symptoms upon presentation to the emergency room on both occasions and thereafter while in the hospital. The records reviewed show that Kendall Brodersen was treated differently by Sioux Valley Hospital than other patients similarly situated. He was not given a medical screening examination consistent with or comparable to that given to other patients.

Phillips aff. at ¶ 10.[14]

The trial judge's function in considering a motion for summary judgment is not to eval-

---

14. The Hospital and Defendant Gary have objected to the 48 medical record extracts relied on by

Brodersen on the ground that the sample is not random and as such does not constitute a repre-

uate and weigh the evidence, but rather to determine whether there is a genuine issue for trial. *Johnson*, 906 F.2d at 1237. Here, the court concludes that Brodersen has generated material fact questions regarding whether the Hospital provided Brodersen with treatment which deviated from the Hospital's standard procedures for similarly situated patients. In particular, an material question of fact has been raised concerning whether the standard policy at the Hospital regarding the conducting of EKGs on patients who present with chest pain was followed in this instance. In light of the Hospital's EKG policy, that absence of the performance of an EKG on Kendall creates a material question of fact which is the province of the jury to determine. Second, a material fact question has been generated as to whether the standard policy at the Hospital was followed in regard to the placement of patients suffering from chest pains in the Hospital's cardiac unit. The court notes that neither Gary nor Weise's affidavits address either the failure to obtain an EKG or to transfer Brodersen to the Hospital's cardiac unit.

Furthermore, the court finds that the material produced by Brodersen in the form of the affidavits of Dr. Phillips and Lorna Jahde raises a question as to whether a similarly situated patient who presents with chest pains would have been told to return to the emergency room nearly four hours later for x-rays without the benefit of an examination by a physician or the conducting of an EKG. Dr. Phillips states in his affidavit that Kendall "was not given a medical screening examination consistent with or comparable to that given to other patients." Phillips Aff. at ¶ 10. Thus, the court concludes that Broder-

sen has produced sufficient evidence such that a reasonable jury could return a verdict for her. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Allison*, 28 F.3d at 66.

Therefore, summary judgment is inappropriate on Brodersen's claims against the Hospital on the grounds that the Hospital violated EMTALA by failing to provide Kendall with appropriate medical screening.

### b. Failure to Stabilize Claim

The court next takes up Brodersen's failure to stabilize claim. Brodersen also asserts that the Hospital inappropriately transferred Kendall when it released him on the morning of January 27, 1991. EMTALA requires that a hospital which has determined that a patient has an "emergency medical condition" must stabilize the patient before transferring him.[15] *See* 42 U.S.C.A. § 1395dd(c).

> To succeed on a section 1395dd(b) claim, a plaintiff must present evidence that the patient had an emergency medical condition, the hospital knew of the condition, the patient was not stabilized before being transferred, and the hospital neither obtained the patient's consent to transfer nor completed a certificate indicating the transfer would be beneficial to the patient and was appropriate.

*Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994); *Baber*, 977 F.2d at 883.

■ Here, the Hospital asserts that because Brodersen has failed to present any evidence that the Hospital knew Kendall had an emergency medical condition at the time of his transfer, the court need not inquire as to whether he was stabilized prior to his transfer. In response, Brodersen first as-

sentative analysis of similarly situated patients. The Hospital has provided the court with 17 additional extracts which it contends demonstrate that patients reporting symptoms similar to those of Kendall were not given EKGs when they presented to the Hospital, and 10 additional extracts which demonstrate that Title XIX and privately insured patients alike were given EKGs when they presented to the Hospital. Because the Hospital has not presented the affidavit of any expert comparing these new patient records with the records supplied by Brodersen, the court is left to speculate regarding their actual similarity. For instance, the court notes that, in

the sampling provided by Brodersen, the ages of the patients range from 29 to 69 years of age. The extracts presented by the Hospital by contrast, even though it is a far smaller sampling, reflect age ranges from 18 to 96, with a fair number of octogenarians and septuagenarians. With this in mind, the court concludes that it is for the jury to decide the probative value of these extracts.

15. Under EMTALA, the term "transfer" includes the discharge of the patient. 42 U.S.C. § 1395dd(e)(4).

serts that the court should impose an objective, rather than an actual subjective, knowledge requirement. The court, however, notes that every circuit to examine this question has held the plaintiff must prove the hospital had actual knowledge of the individual's unstabilized emergency medical condition in order to succeed with a claim under § 1395dd(b). *See Urban ex rel Urban v. King,* 43 F.3d 523, 525 (10th Cir.1994) (holding that "[a] plain reading of the statute reveals actual knowledge of an unstabilized emergency medical condition as a requirement to establish liability. Subsection (c) requires the hospital to meet certain transfer conditions if the individual's emergency medical condition is not stabilized. The hospital cannot be held to stabilize an emergency situation without knowing an emergency exists."); *Baber,* 977 F.2d at 883 (holding that section 1395dd(c)'s "transfer requirements do not apply unless the hospital actually determines that the patient suffers from an emergency medical condition."); *see Gatewood,* 933 F.2d at 1041 (stabilization and transfer provisions "are triggered only after a hospital determines that an individual has an emergency medical condition"); *Cleland,* 917 F.2d at 271 ("[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition"); *Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1134 (6th Cir.1990) (holding that EMTALA requires hospitals to stabilize patient "[o]nce a patient is found to suffer from an emergency medical condition"); *Coleman v. McCurtain Memorial Medical Mgt., Inc.,* 771 F.Supp. 343, 346 (E.D.Okla.1991) ("a plain reading of the Act dictates that the provisions concerning stabilization and transfer are implicated only after the hospital determines that an emergency medical condition exists").

■ While conceding that the vast majority of case law is against her on this issue, indeed she cites no contrary case law and the court has not located any such authority, Brodersen argued at the hearing and in her supplemental brief that the determination of whether the Hospital had actual knowledge of Kendall's emergency medical condition when he was released on the morning of January 27, 1995, is a question for the trier

of fact. Although the court finds this to be an extremely close question, given the evidence generated to date, the court concludes that a material fact question exists on the issue of whether or not the Hospital knew Kendall had an emergency medical condition when he presented on the morning of January 27, 1995.

The Hospital has presented the affidavits of both nurse Weise and Dr. Gary. Each indicate in their respective affidavit that they did not deem Kendall to be suffering from an emergency medical condition when he was released on the morning of January 27, 1991. In response, Brodersen directs the court's attention to the emergency room records and affidavit of Dr. Phillips indicating that on the morning of January 27, 1991, Kendall was experiencing symptoms which would appear to raise a question of fact as to whether the Hospital's personnel actually determined that Kendall had an "emergency medical condition." When Kendall presented on January 27, 1991, he complained of back and chest pain, nausea, spitting up blood, and that he had been unable to eat anything for two days. He also reported that he had seen Dr. Veit the day before and that Dr. Veit had told him to go to the emergency room that evening if his condition did not improve. Weise conducted an examination of Kendall and found that he had a low grade fever. He was told to return for an x-ray. Brodersen has further presented the affidavit of Dr. Phillips, who states, in pertinent part, that:

> When Kendall Brodersen was discharged from the hospital at approximately 4:10, January 27, 1991, he was *not* stable, he was suffering from an emergency medical condition requiring immediate hospitalization and any competent medical professional must recognize that.

Phillips aff. at ¶ 9. Given this record, caution would dictate toward allowing a jury to decide whether the Hospital did in fact determine that Kendall had an "emergency medical condition" at the time of his release on the morning of January 27, 1991, despite the Hospital's emphatic denial of this claim. In sum, Dr. Phillips' affidavit clearly generates a material question of fact if the standard is

an objective one. This court rejects that notion and at trial will require Brodersen to prove actual knowledge on behalf of the Hospital. While the evidence on this question is extremely thin, Brodersen will have an opportunity to persuade the jury that the Hospital's denial of knowledge of Kendall's condition is false. The court will be willing to revisit this issue post-trial and examine it anew in light of the actual evidence presented at trial.[16] *See Griffith v. Mt. Carmel Medical Ctr.*, 831 F.Supp. 1532, 1544–45 (D.Kan.1993) (denying partial summary judgment on failure to stabilize treatment issue where plaintiff presented emergency room records indicating that the plaintiff was experiencing symptoms which raised a question of fact as to whether the plaintiff had an emergency medical condition).

Therefore, summary judgment is inappropriate on Brodersen's claim against the Hospital on the grounds that the Hospital violated EMTALA by failing to stabilize Kendall before releasing him.

### c. Failure to Provide Emergency Medical Care Because of Improper Motive

■ The Hospital further asserts that even if Brodersen is capable of generating a material fact question on the issue of Kendall's treatment, she is unable to meet a second requirement under EMTALA: that the disparate treatment received was the result of an economic motive or bias. This issue requires the court to first determine if a cause of action under EMTALA will lie only when the Hospital's actions or inactions are the result of economic motive. If the court concludes that this is a valid requirement then it must ascertain whether Brodersen has generated a material fact question regarding an economic motive behind the Hospital's treatment of Kendall.

The court notes first the significant split in authority on the issue of whether economic motive or bias must be demonstrated as a prerequisite under EMTALA and the silence

of the Eighth Circuit Court of Appeals on this issue. Although the Eighth Circuit Court of Appeals was confronted with the issue of EMTALA's requirements in *Williams*, 34 F.3d at 697, the Court of Appeals was not asked to decide the question of whether a plaintiff must demonstrate that the hospital's actions were prompted by an economic motive in order to prevail under EMTALA. Not surprisingly, both parties claim that the better reasoned view in this split of authority supports their own position. Courts are currently divided over the question of whether a showing of economic motive is required in order to find an EMTALA violation. *Compare Cleland*, 917 F.2d at 272 (indicating that "there is nothing in the legislative history showing that Congress had any concern about the treatment accorded any patients other than the indigent and uninsured."); *Coleman v. McCurtain Memorial Medical Management*, 771 F.Supp. 343 (E.D.Okla.1991) (holding that a claim of misdiagnosis rather than a claim of insufficient care because of improper economic motive is beyond the regulation of EMTALA); *Stewart v. Myrick*, 731 F.Supp. 433 (D.Kan.1990) (holding that EMTALA was designed to protect those who are denied medical care for economic reasons); *Nichols v. Estabrook*, 741 F.Supp. 325 (D.N.H.1989) (failure to allege that financial condition of the plaintiff affected treatment placed the claim beyond the regulation of EMTALA); and *Evitt v. University Heights Hosp.*, 727 F.Supp. 495 (S.D.Ind.1989) (requiring an indigent or uninsured plaintiff for a cause of action under EMTALA) *with Gatewood*, 933 F.2d at 1041 (concluding that hospital's motives irrelevant) and *Deberry v. Sherman Hosp. Ass'n*, 769 F.Supp. 1030, 1034 (N.D.Ill.1991) (following *Gatewood* and rejecting any requirement that economic motive need be established). Therefore, the court must undertake an evaluation of cases on both sides of the issue and determine which to follow in this case.

---

**16.** Permitting this issue to go the jury is in keeping with the spirit of the Uhlenhopp rule, *see generally Reed v. Chrysler Corp.*, 494 N.W.2d 224, 228–29 (Iowa 1992), under which Iowa courts are instructed that the better practice is to not grant directed verdicts "in routine cases or in cases that are at all close" but to submit the question to the jury thereby avoiding the necessity of another trial in the event of error. *See id.* at 229. Likewise, in permitting this issue to go to trial, the court avoids the necessity of another trial in the event of error.

### i. The Split In Authority On Requiring Economic Motive to Be Shown

One side of the debate is exemplified by the Sixth Circuit's decision in *Cleland*, 917 F.2d 266. In *Cleland*, the plaintiffs took their son to the defendant hospital's emergency room where he was diagnosed as having the flu and sent home. Less than twenty-four hours later, the child died. *Id.* at 268. The plaintiffs alleged that the hospital had violated EMTALA by failing to adequately screen, failing to adequately treat, and discharging without stabilizing an emergency condition. *Id.* at 269. The court ruled for the defendant hospital, stating that the hospital had provided the appropriate emergency care as dictated by EMTALA. *Id.* at 271. In its analysis, the court recognized that a major force behind the creation of EMTALA had been the intent to eliminate patient dumping. *Id.* In ruling for the defendant hospital, the court considered the standard required by "appropriate" in section 1395dd(a). *Id.* at 272. Rejecting a malpractice standard, the court noted that "appropriate" as used in section 1395dd(a) "must more correctly be interpreted to refer to the motives with which the hospital acts. If it acts in the same manner as it would have for the usual paying patient, then the screening provided is 'appropriate' within the meaning of the statute." *Id.* In other words, medical treatment will be deemed inappropriate under the EMTALA, only if, because of improper motive, the treatment varies from that which the hospital normally administers to patients. Thus, the court created an improper motive requirement for an EMTALA violation. *Id.* Several district courts have arrived at the same conclusion. *See Nichols*, 741 F.Supp. at 330 (holding, that because Congressional intent in passing EMTALA was "to provide some assurance that patients with emergency medical conditions will be examined and treated regardless of their financial resources," EMTALA only applies to those cases in which plaintiffs are denied adequate care due to economic motives); *Evitt*, 727 F.Supp. at 497–98 (concluding, that because Congress had enacted EMTALA to "combat the growing problem of 'patient dumping,'" EMTALA was "specifically directed toward preventing prospective patients from being turned away for economic reasons."); *Myrick*, 731 F.Supp. at 436 (following the reasoning of *Evitt*, the court ruled that EMTALA did not apply to the plaintiff's claim); *Coleman*, 771 F.Supp. at 347 (rely upon the reasoning of *Evitt*, the court denied the plaintiff's claim of an EMTALA violation).[17]

17. In *Nichols*, 741 F.Supp. 325, the plaintiffs were the parents of a sixteen week old infant who had been suffering from vomiting and diarrhea. They took their son to the hospital emergency room for treatment. After examining the baby and taking a blood sample, the doctor ordered the baby taken to another hospital. The doctor did not provide an ambulance to transport the baby because he did not feel an emergency condition existed. Contrary to the doctor's diagnosis, however, the baby was seriously ill, and died approximately forty-five minutes after arriving at the second hospital. *Id.* at 326. The plaintiffs alleged that EMTALA established a statutory duty of care. *Id.* The plaintiffs argued that the defendant doctor's misdiagnosis breached that duty and was negligent per se. In rejecting this argument, the court concluded that Congressional intent in passing EMTALA was "to provide some assurance that patients with emergency medical conditions will be examined and treated regardless of their financial resources." *Id.* at 330. Therefore, the court concluded that EMTALA only applies to those cases where plaintiffs are denied adequate care due to economic motives. Because the plaintiffs had not alleged an impermissible economic motive in the doctor's failure to properly treat their child, the court found no cause of action under EMTALA. *Id.*

In *Evitt*, 727 F.Supp. 495, the plaintiff had arrived at the defendant hospital's emergency room complaining of severe chest pain. There, a doctor and a nurse examined the plaintiff and instructed the plaintiff to stop taking a prescribed medicine, to take a different medicine, and to call her personal physician. The plaintiff was then sent home. Later that day, the plaintiff returned to the hospital and was diagnosed as suffering a heart attack. *Id.* at 496. The plaintiff alleged that the hospital had violated section 1395dd(a) by not providing an appropriate medical screening. Alternatively, she alleged the hospital had violated section 1395dd(b) by not stabilizing her condition, or it had violated section 1395dd(c) by not properly transferring her to another facility. *Id.* Because the plaintiff was unable to present evidence that she had been turned away from the hospital for economic reasons, the court ruled in favor of the defendant hospital, concluded that EMTALA provides a cause of action only when care is denied because of economic factors. *Id.* at 498. The court noted that Congress had enacted EMTALA to "combat the growing problem of 'patient dumping.'"

The other side of the debate is reflected in the D.C. Circuit's decision in *Gatewood*, 933 F.2d at 1037. In *Gatewood*, the plaintiff's husband was taken to the hospital emergency room with pain in his left arm and chest. A doctor examined and diagnosed him, and then sent him home. The next day, the patient died of a heart attack. *Id.* at 1039. In her lawsuit, the plaintiff alleged violations of EMTALA and a state malpractice claim. *Id.* In ruling that EMTALA should apply regardless of motive, the court flatly rejected any motive requirement for an EMTALA violation. In its analysis, the court recognized the legislative history's express intent to remedy the lack of treatment for the uninsured. *Id.* at 1040. The court, however, felt bound to follow the express language of the statute: "the Act's plain language unambiguously extends its protections to 'any individual' who seeks emergency room assistance. . . . We conclude that we are bound by statutory language this clear, at least, where as here, it is not manifestly inconsistent with legislative intent." *Id.* In ruling for the defendant, the court held that the hospital had met the requirements found in section 1395dd(a). *Id.* The court, in concluding that motive is irrelevant in determining whether the emergency care has been "appropriate," pointed out:

> [A]ny departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act. The motive for such departure is not important to this analysis, which applies

whenever and for whatever reason a patient is denied the same level of care provided others and guaranteed him or her by subsection 1395dd(a).

*Id.* Instead, " 'appropriate' screening is properly determined . . . by reference to a hospital's screening procedures." *Id.* Thus, under this analysis, any deviation from normal procedure may be construed as inappropriate under EMTALA. The motive underlying that deviation is irrelevant. Thus, the *Gatewood* court differed substantially from the *Cleland* court which had ruled that impermissible motive is a determining factor in proving an EMTALA violation. The *Gatewood* decision, too, has been followed by a number of courts. *See Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 857–58 (4th Cir. 1994) (concluding, after examining the respective positions staked out by the courts in *Gatewood* and *Cleland*, that the conclusion reached by the *Gatewood* court was the better reasoned view); *Jones v. Wake County Hosp. Sys., Inc.*, 786 F.Supp. 538, 544 (E.D.N.C.1991) (following *Gatewood* decision and rejecting any motive requirement for a claim under EMTALA); *Deberry v. Sherman Hosp. Ass'n*, 741 F.Supp. 1302, 1305–06 (N.D.Ill.1990) (noting that although the legislative history of EMTALA indicated an intent to prohibit patient dumping, the court refused to interpret EMTALA contrary to its express language concluding that a cause of action under EMTALA exists irrespective of any claim of economic motive).[18]

---

*Id.* at 497. Therefore, the court concluded that EMTALA was "specifically directed toward preventing prospective patients from being turned away for economic reasons." *Id.* The court further concluded that to allow the plaintiff to recover under EMTALA would lead to federal preemption of state malpractice law, a result which Congress had not intended. *Id.* at 498. In order to avoid federal preemption, the court ruled that "appropriate" under EMTALA requires establishing a denial of care because of economic factors. *Id.*

18. In *Deberry*, 741 F.Supp. 1302, the plaintiff's daughter was brought to the defendant hospital's emergency room suffering from a fever, rash, stiff neck, irritability and lethargy. The plaintiff contended that her daughter was treated but not stabilized before being sent her home. Two days later, after her daughter's condition had worsened, the plaintiff returned to the hospital with

her daughter. The doctor ultimately diagnosed the child to be suffering from spinal meningitis. *Id.* at 1303. The plaintiff alleged a violation of EMTALA and a state medical malpractice claim. *Id.* Although noting that the legislative history of EMTALA indicated an intent to prohibit patient dumping, the court refused to interpret EMTALA contrary to its express language:

> [W]hile the legislative history of § 1395dd indicates that perhaps the principle reason for its enactment was the refusal to treat indigents by certain hospitals . . . the language of the statute quite plainly goes further . . . Obviously we will not allow a few references to the statute's purpose in the legislative history to override the plain meaning of its terms as enacted.

*Id.* at 1306. As such, the court would not limit an EMTALA cause of action to claims of refusal of medical care based on an economic motive. *Id.* Rather, the court ruled that a cause of action

### ii. Analysis

EMTALA's legislative history suggests that Congress enacted EMTALA in order to remedy incidents where emergency care was denied because of economic motive. Yet, any reference to economic or an illegitimate motive are conspicuously absent from EMTALA's provisions. The court therefore concludes that, between the two groups of cases, the better reasoned approach is found in those decisions holding that a defendant's motive in failing to provide appropriate emergency treatment is irrelevant. *See Gatewood,* 933 F.2d at 1041; *Power,* 42 F.3d at 857–58. The D.C. Circuit's approach is more faithful to the language of the statute. Section 1395dd(a) entitles an individual to the standard screening procedure accorded by that hospital to other patients. EMTALA is silent as to any requirement regarding proof of economic motive on the part of a hospital as a prerequisite to recovery. The language of subsection 1395dd(a) simply refers to "any individual" who presents to a hospital's emergency room. The court notes that although the legislative history focuses on concern for hospitals refusing to treat patients based on improper motives, Congress did not incorporate any such motive requirement into EMTALA. Congress clearly could have done so had they chosen this route.

The best means for determining whom Congress intended to protect under EMTALA is an examination of the language of EMTALA. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *United States ex rel. Harlan v. Bacon,* 21 F.3d 209, 210 (8th Cir.1994) ("When construing a statute, we are obliged to look first to the plain meaning of the words employed by the legislature," and the court "must give effect to the unambiguously expressed intent of Congress," citing *Chevron* ); *United States v. Manthei,* 979 F.2d 124, 126 (8th Cir.1992) ("When interpreting statutory language, the court must first look to the plain meaning of the language," citing *North Dakota v. United States,* 460 U.S. 300, 312–13, 103 S.Ct. 1095, 1102–03, 75 L.Ed.2d 77 (1983)). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Thus, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair,* 489 U.S. at 241–42, 109 S.Ct. at 1030–31; *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897); *Oneale v. Thornton,* 10 U.S. (6 Cranch) 53, 68, 3 L.Ed. 150 (1810)).

When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair,* 489 U.S. at 241, 109 S.Ct. at 1030 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)); *Melahn v. Pennock Ins., Inc.,* 965 F.2d 1497, 1502 (8th Cir.1992) (plain meaning of a statute governs over ambiguous legislative history,

---

under EMTALA exists regardless of the plaintiff's ability to pay for medical care. *Id.* at 1305. In concluding that an EMTALA violation existed irrespective of any claim of economic motive, the court relied upon two factors. First, the legislative history of EMTALA would not be considered in interpretation unless ambiguity arose from the statute's language. *Id.* at 1306. Because EMTALA expressly provides a cause of action for any patient, the court refused to limit its scope. Second, the court disagreed with *Evitt's* analysis of federal preemption. *Id.* at 1307. The court concluded that the *Evitt* court erred because it "had assumed that double coverage was prohibited." *Id.* The *Deberry* court, however, read section 1395dd(f) to mean that EMTALA should not be construed to regulate to the exclusion of state malpractice law. *Id.* EMTALA therefore could regulate the same conduct that state malpractice law regulated. *Id.* Only when it was impossible to comply with both EMTALA and state law, the court concluded, would EMTALA preempt state medical malpractice law. *Id.* Thus, EMTALA applying to any person would not exclude state malpractice law. Instead, the court noted that such an interpretation "simply means that more conduct will be proscribed by both federal and state law." *Id.* Therefore, the court held EMTALA applied to any person regardless of motive. *Id.*

citing *Ron Pair Enterprises* ). The plain meaning of a statute is decisive, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 452, 107 S.Ct. 1207, 1223–24, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring in judgment) (ordinary meaning governs unless implementing it would be "patent absurdity").

■ However, "[p]lain meaning, like beauty, is sometimes in the eye of the beholder," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 1603, 84 L.Ed.2d 643 (1985). Thus, the court must not reach its decision about the meaning of a statute

> by a strict construction of the words of the Act, nor by application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction. But it is not our function to engraft on a statute additions which we think the legislature logically might or should have made.

*Bacon*, 21 F.3d at 210 (quoting *United States v. Cooper Corporation*, 312 U.S. 600, 605, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941)). Thus, the court must assume that the words of a statute, construed in their ordinary meaning, accurately express the legislative purpose, and the court should decline to frustrate the plain meaning of the words chosen by Congress. *United States v. Talley*, 16 F.3d 972, 976 (8th Cir.1994).

Here, the plain meaning of EMTALA's language does not require the showing of an economic motive for a hospital's failure to provide appropriate care. As the Fourth Circuit noted in its *Power* decision:

> We are persuaded that the D.C. Circuit's rejection of an improper motive requirement is indeed the correct approach. *See Jones v. Wake County Hosp. Sys., Inc.*, 786 F.Supp. 538, 544 (E.D.N.C.1991); *Deberry v. Sherman Hosp. Ass'n*, 769 F.Supp. 1030, 1034 (N.D.Ill.1991) (both following *Gatewood* and rejecting motive requirement). First, there is nothing in the statute itself that requires proof of indigence, inability to pay, or any other improper motive on the part of a hospital as a prerequisite to recovery. The language of subsection 1395dd(a) simply refers to "any individual" who presents to the emergency room. Second, it seems to us that the expanse of motives suggested by the Sixth Circuit in *Cleland* is so broad as to be no limit at all, and as a practical matter amounts to not having a motive requirement. Anyone who alleges that she did not receive an appropriate medical screening examination can simply find an improper motive that fits, whether it is sex, nationality, income, or occupation, and simply allege it. Which leads, thirdly, to the most fundamental problem with the motive requirement: the proof predicament. We agree with Power's position that having to prove the existence of an improper motive on the part of a hospital, its employees or its physicians, would make a civil EMTALA claim virtually impossible. We do not believe that proving the inner thoughts and prejudices of attending hospital personnel is required in order to recover under EMTALA.

*Id.* at 857–58. The court concurs in all regard with the Fourth Circuit's assessment of the weaknesses of the *Cleland* decision and its progeny. Accordingly, the court concludes that EMTALA should apply to any person denied sufficient emergency medical care regardless of the defendant's motive.[19]

---

19. In the alternative, even if the Eighth Circuit were to follow the Sixth Circuit's decision in *Cleland,* the court concludes that Brodersen has generated a material fact question on the issue of whether an economic motive played a role in the treatment that Kendall received at the Hospital. Jahde states in ¶ 8 of her affidavit that

8. I asked, "Why isn't [this patient] in the [cardiac] unit?" I was told that the sick patient Kendall Brodersen, was a Title XIX patient—a person who does not have his own medical insurance but for whom the state pays

### B. Defendant Allender's Motion for Summary Judgment

Defendant Allender's motion for summary judgment is premised on the assumption that the Hospital's motion for summary judgment is valid. However, because the court has concluded that Brodersen has generated material fact questions regarding whether the Hospital provided Kendall with treatment which deviated from the Hospital's standard procedures for similarly situated patients, summary judgment is inappropriate on Brodersen's claims that the Hospital violated the EMTALA by failing to provide Kendall with appropriate medical screening. Therefore, the basis for Allender's motion for summary judgment, that the Hospital's summary judgment motion is meritorious, is incorrect. As a result, the court does have subject matter jurisdiction over Defendant Allender pursuant to 42 U.S.C. § 1395 and his motion for summary judgment shall also be denied. This holding also disposes of Defendants Veit and Gary's joinder in the Hospital's motion for summary judgment.

### C. Defendant Allender's Third Motion for Summary Judgment and For Ruling Under Federal Rule of Evidence 104(a)

Defendant Allender has moved to have the court declare that Brodersen's experts, Thomas L. Bennett, James D. Kimball and Steven J. Phillips are not qualified to testify regarding the applicable standard of care to which Allender must be held. Defendant Allender has also filed a companion motion for summary judgment which raises the issue of whether Plaintiff's experts, Dr. Bennett, Dr. Kimball, and Dr. Phillips, are qualified to testify against Allender regarding the appropriate standard of care. Brodersen has identified three expert witnesses to testify as to the negligence issue, Drs. Bennett, Kimball

and Phillips. Dr. Bennett is the Iowa State Medical Examiner and has an extensive background in forensic pathology. Dr. Kimball is a medical doctor who is on the faculty at Broadlawns Medical Center. Dr. Phillips is a cardiovascular surgeon. None, however, is a chiropractor. Defendant Allender filed his third motion for summary judgment on the ground that Brodersen's evidence cannot, as a matter of law, establish a violation of the applicable standard of care. Specifically, Allender argues that none of Brodersen's experts are qualified to testify to the standard of care for a chiropractor and that, because Brodersen does not have a qualified expert, she cannot establish either the standard of care or a violation of the standard of care, two essential elements of a malpractice claim.[20]

Under Iowa law, in order to establish a prima facie case of medical malpractice, "plaintiff must show evidence which establishes the applicable standard of care, demonstrate this standard has been violated, and develop a causal relationship between the violation and the alleged harm." *Kennis v. Mercy Hosp. Medical Ctr.*, 491 N.W.2d 161, 165 (Iowa 1992); *see Daboll v. Hoden*, 222 N.W.2d 727, 734 (Iowa 1974). The Iowa Supreme Court has recognized three means of establishing specific negligence of a medical provider:

> "One is through expert testimony, the second through evidence showing the physician's lack of care so obvious as to be within comprehension of a layman, and the third, (actually an extension of the second) through evidence that the physician injured a part of the body not involved in the treatment. The first means is the rule and the others are exceptions."

medical and hospital expenses—with a history of drug abuse.

Jahde aff. at ¶ 8. In her supplemental affidavit, Jahde states that it was Barrie Black, Kendall's primary nurse, who informed her that Kendall was a Title XIX patient with a history of drug use. Jahde supplemental aff. at ¶¶ 18–19. Jahde's affidavits raise the specter that economics played a role in the disparate treatment Kendall received while at the Hospital.

20. It is beyond dispute that the standard of care itself is substantive. "What is such a standard of care, whether it has been violated, and whether such violation is the proximate cause of plaintiff's injury—in short, the substantive elements of a medical malpractice suit—are all questions to be determined by state law in a diversity action." *Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir.1982).

*Kennis,* 491 N.W.2d at 165 (quoting *Perin v. Hayne,* 210 N.W.2d 609, 613 (Iowa 1973)). Generally, when the ordinary care of a medical provider is at issue, only experts can testify and establish the standard of care and the skill required of that medical provider. *See Kennis,* 491 N.W.2d at 165; *Welte v. Bello,* 482 N.W.2d 437, 439 (Iowa 1992); *Perin,* 210 N.W.2d at 613. The standard of care to which a medical provider has failed to adhere must be established by expert testimony because "a jury generally lacks the 'requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert.'" *Rosenberg ex rel. Rosenberg v. Cahill,* 99 N.J. 318, 325, 492 A.2d 371, 374 (1985) (citations omitted).

As the Iowa Supreme Court has held:

> The general rule is that one sued for malpractice is entitled to have his treatment tested by the rules and principles of the school of medicine to which he belongs, not those of some other school. If he treats the patient with the ordinary skill and care of those of his school he is not answerable for poor results.

*Correll v. Goodfellow,* 255 Iowa 1237, 1244, 125 N.W.2d 745, 749 (1964); *see Boudreaux v. Panger,* 490 So.2d 1083, 1085 (La.1986) (In a medical malpractice action against a chiropractor, a chiropractor is required to exercise the degree of care and skill ordinarily exercised by other chiropractors in a similar community); *Kerkman v. Hintz,* 142 Wis.2d 404, 418 N.W.2d 795, 802 (1988) (same, quoting *Boudreaux v. Panger,* 490 So.2d 1083, 1085 (La.1986)); *Mostrom v. Pettibon,* 25 Wash. App. 158, 162, 607 P.2d 864, 866 (1980) (chiropractor is held to the standard of care of a reasonable chiropractor in the same circumstances); *Maxwell v. McCaffrey,* 219 Va. 909, 913, 252 S.E.2d 342 (1979) ("the standard of due medical care applicable to chiropractors is that of other like chiropractors in good standing in the same or similar localities as defendant"); *Janssen v. Mulder,* 232 Mich. 183, 190, 205 N.W. 159 (1925) (plaintiff must prove that chiropractor was negligent through the testimony of one engaged in treatment by similar methods to those employed by defendant).[21]

In *Taormina v. Goodman,* 63 A.D.2d 1018, 406 N.Y.S.2d 350 (1978), the testimony of a medical doctor was offered as an expert against a defendant chiropractor. The New York court held that because a medical doctor was not a member of the chiropractic discipline, the doctor was not competent to testify to the alleged malpractice of a chiropractor. *Id.,* 406 N.Y.S.2d at 351–352. The rationale of the *Taormina* court is significant:

> In the instant action to recover damages predicated upon the malpractice of a chiropractor, plaintiffs' proof at the trial did not include the testimony of any chiropractic experts, but rather medical doctors, whose knowledge of chiropractics was admittedly quite limited. The testimony of these doctors only served to establish defendant's deviation from a medical standard of care in his treatment of the plaintiff husband. Accordingly, there was no competent trial evidence upon which the jury could have predicated its finding (in accordance with the court's charge) that defendant had failed to exercise 'that degree of care that a reasonably prudent chiropractor would exercise under the circumstances.' Under present New York law, the practice of chiropractic is separate and distinct from the practice of medicine (see Education Law, art. 132; *Vidra v. Shoman,* 59 A.D.2d 714, 398 N.Y.S.2d 377 [ (1977) ] ), so that a physician's standard of care can no longer be considered controlling upon a chiropractor in the practice of his profession (*cf.*

---

**21.** The court does not read the Iowa Supreme Court's decision in *Wick v. Henderson,* 485 N.W.2d 645 (Iowa 1992) to have altered the Iowa court's requirements regarding the establishment of the requisite standard of care through expert testimony. In *Wick,* the plaintiff's ulnar nerve in her left arm was injured during surgery, and the plaintiff brought suit against the hospital and anesthesiologist. *Id.* at 647. In reversing the decision of the trial court, the Iowa Supreme Court held that the plaintiff's expert, a neurologist, was qualified to testify as to the responsibility of the anesthetist to monitor " 'the position, the location and pressure against the patient's arm during surgery.' " *Id.* at 648. Justice Harris indicated in his dissent that in his view the trial court's decision to strike the testimony of plaintiff's expert was not an abuse of discretion. *Id.* at 651 (Harris, J., dissenting).

*Brown v. Shyne*, 242 N.Y. 176, 151 N.E. 197 [ (1926) ] ).

*Id.*, 406 N.Y.S.2d at 351–352.

■ Applying the principles of the cases discussed above to this case, a medical doctor cannot be permitted to offer testimony to a jury to establish what the proper chiropractic standard of care was in this case and what, if any, departures from that standard of care was committed by Dr. Allender. *See Morgan v. Hill*, 663 S.W.2d 232, 234 (Ky.Ct.App. 1984) (physician was ruled incompetent to testify as to the standard of care a chiropractor); *Johnson v. Lawrence*, 720 S.W.2d 50, 54–55 (Tenn.Ct.App.1986) (holding that testimony of medical doctors was not competent to prove the standard of care required of chiropractors); *Maxwell*, 219 Va. 909, 252 S.E.2d at 345 (holding that trial court did not abuse its discretion in refusing to permit orthopedic surgeon to testify regarding standard of care required of chiropractor); *cf. Rosenberg*, 99 N.J. at 334, 492 A.2d at 378 (holding that medical doctors may be competent to testify as to standard of care required of chiropractor but only as to those matters which each discipline share in common in terms of education, licensure, and training).[22]

The evidence produced by Brodersen includes the testimony of three medical doctors, but does not include chiropractic testimony as to the standards of the chiropractic profession. The lack of testimony by a licensed chiropractor defeats Brodersen's malpractice case against Allender. While the orthopedic surgeons certainly are experts in their own field, none of the physicians admitted to any expertise or skill in the chiropractic field. Thus, even under the most liberal standard, as exemplified by the *Rosenberg* case, none of the three physicians are qualified to testify as to the standard of care required of a chiropractor.

■ Finally, Brodersen contends that the testimony of her medical experts is unnecessary to establish a violation of a chiropractic standard of care since Allender, by his own admission, has conceded that he would be required to refer, to a physician, a patient with the medical problems presented by Kendall. Brodersen is correct that Allender himself has testified to the chiropractic standard of care on this issue and that testimony on this narrow question need not be offered by Brodersen's experts. The fighting issue thus becomes whether Allender in fact referred Kendall to a medical doctor. Brodersen asserts that there is at least a genuine issue of material fact as to whether or not Allender referred Kendall to a physician, because Allender's records on Kendall's visits do not reflect such a referral.

Brodersen's argument is founded on the admissibility of the "absence of entry" or "negative evidence" of an entry under an

---

**22.** Brodersen's reliance on the cases cited in her brief, for the proposition that a medical doctor may testify regarding the standard of care required of a chiropractor, is misplaced. In *Tremmel v. Wallman*, 166 A.D.2d 582, 560 N.Y.S.2d 868 (1990), the plaintiff had both a chiropractic expert and board certified neurologist appear on her behalf and testify that the defendant had departed from accepted chiropractic practice. *Id.*, 166 A.D.2d at 582, 560 N.Y.S.2d at 868. Thus, unlike this case, the plaintiff in *Tremmel* did have a chiropractor testify as to the standard of care. More importantly, however, there is no indication in the case that there was any objection to the neurologist's testimony. The decision in *Kwasny v. Feinberg*, 157 A.D.2d 396, 557 N.Y.S.2d 381 (1990), suffers from the same infirmity as *Tremmel*. In *Kwasny*, the plaintiff presented the testimony of a chiropractor and two neurosurgeons without objection that the defendant had departed from good chiropractic practice. *Id.*, 157 A.D.2d at 400, 557 N.Y.S.2d at 384. Furthermore, the defendant's own chiropractic expert supported the jury's conclusion that the defendant had departed from good chiropractic practice in treating the plaintiff. *Id.*, 157 A.D.2d at 401, 557 N.Y.S.2d at 384. The Colorado Court of Appeals' decision in *Blankenship v. Iowa Nat'l Mut. Ins. Co.*, 41 Colo.App. 430, 588 P.2d 888 (1978) adds little in the way of support for Brodersen's proposition that her experts can testify to the standard of care required of a chiropractor. In *Blankenship*, the plaintiffs who had been injured in an automobile accident brought suit against their insurer for chiropractic services they had received following their accident. *Id.*, 41 Colo.App. at 431, 588 P.2d at 889. The court held that the trial court had not erred in permitting the insurer to present an orthopedic surgeon to testify that the chiropractic treatments received by plaintiffs were not "reasonable and necessary." *Id.*, 41 Colo.App. at 432, 588 P.2d at 890. Thus, the issue in *Blankenship*, unlike this case, was not based on the standard of care and degree of skill customarily observed by chiropractors. *Id.*, 41 Colo.App. at 432, 588 P.2d at 890.

exception to the rule against hearsay found in Federal Rule of Evidence 803(7). Federal Rule of Evidence 803(7) provides that evidence that a matter is not included in records kept in the course of a regularly conducted business activity, if offered to prove the nonexistence of the matter, is not excluded by the hearsay rule "if the matter was of a kind of which a ... record ... was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness." [23] The logic of this rule was eloquently and forcefully explained by Professor Wigmore:

> When a book purports to contain all items transacted within the scope of the book's subject, the absence of an entry of transaction of a specific purport is in plain implication a statement by the maker of the book that no such transaction was had. The psychology of it is the same as that of testimony on the stand by a person who denies that a sound took place in his presence because he heard no such sound. The practical reliability of it is shown by every day's practice in every business house. All industry and commerce is daily conducted on the negative as well as on the affirmative showings of the regular books of entry.

5 J. Wigmore, *Evidence* § 1531 (Chadbourn ed. 1974).

The Eighth Circuit Court of Appeals has described the effect of the "absence of entry" rule found in Rule 803(7) as follows: "Rule 803(7) provides that evidence of the absence of an entry in records regularly kept is admissible as affirmative proof of the nonoccurrence or nonexistence of *a matter normally recorded.*" *Kaiser Aluminum & Chem. Corp. v. Illinois Cent. Gulf R.R. Co.,* 615 F.2d 470, 476 (8th Cir.1980) (emphasis added). In *Kaiser,* the Eighth Circuit Court of Appeals applied that rule by first determining that it was the appellee's "normal business practice" to retain a record of information regarding the inspection and cleaning of its railroad cars. *Id.* When no such records were introduced into evidence, Kaiser contended, and the Eighth Circuit Court of Appeals agreed, that the nonoccurrence or nonexistence of any cleaning or inspection of the cars could be presumed under Rule 803(7). *Id.*

It is apparent from the language of Rule 803(7) that the "absence of entry" rule may only be invoked where the record from which the entry is absent is one "kept in accordance with the provisions of paragraph (6)" of Rule 803. *Fed.R.Evid.* 803(7). Rule 803(6) identifies the appropriate record as one that is "kept in the course of a regularly conducted business activity," and further a record that "it was the regular practice of that business activity to make." *Fed.R.Evid.* 803(6). Allender asserts that it was not his regular business practice to enter referrals to physicians into the records of patients so referred. Brodersen contends that what Allender may or may not regularly do is irrelevant, because the standard for the keeping of records of referrals is an "industry-wide" one. Brodersen's argument for an "industry-wide" standard of recording referrals, while perhaps appealing as a standard of practice, does not state the proper standard for the kind of records to which the "absence of entry" rule applies under the language of Rule 803(6) or the pertinent case law.

Courts with some consistency describe the requirements for admissibility of a record

---

23. Federal Rule of Evidence 803(7) states:

Evidence that a matter is not included in the memoranda reports, records, or data compilations, in any form, kept in accordance with the provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

Federal Rule of Evidence 803(6), which in turn sets forth an exception to the hearsay rule, states in relevant part:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness....

under Rule 803(6), and hence the admissibility of the absence of an entry in such records under Rule 803(7), as including the following four criteria: (1) the record must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of *that business;* (3) the regular practice of *that business* must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge. *See, e.g., Igo v. Coachmen Indus., Inc.,* 938 F.2d 650, 658 (6th Cir.1991) (quoting these requirements from *Redken Labs, Inc. v. Levin,* 843 F.2d 226, 229 (6th Cir.1988), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988)); *In re Custodian of Records of Variety Distrib., Inc.,* 927 F.2d 244, 248 (6th Cir.1991) (also citing *Redken* ); *United States v. Fawaz,* 881 F.2d 259, 266 (6th Cir.1989) (also citing *Redken* ); *Redken,* 843 F.2d at 229 (citing *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1258 (9th Cir.1984)). This court has found no case in which the court looked beyond the particular business in question to see if businesses of the same type, rather than that particular business, normally kept the records in question. Nor has Brodersen cited any authority for this sweeping proposition.

For example, the Eleventh Circuit Court of Appeals held that it was "significant, and essential to admissibility" of a record under Rule 803(6) that

> the record be the product of a "regular practice" of the business, *see United States v. Freidin,* 849 F.2d 716, 719–22 (2d Cir. 1988), in the "usual course" of that business. *See [United States v.] Hawkins,* 905 F.2d [1489,] 1494 [ (11th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991) ].

*United States v. Jacoby,* 955 F.2d 1527, 1537 (11th Cir.1992), *cert. denied sub nom. Skubal v. United States,* —— U.S. ——, 113 S.Ct. 1282, 122 L.Ed.2d 676 (1993); *see also Phoenix Assocs. III v. Stone,* 60 F.3d 95, 101 (2d Cir.1995) (also citing *Freidin* for these requirements); *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 729 (10th Cir.1993) (find-

ing these two requirements in the language of Rule 803(6) and further citing *United States v. Markopoulos,* 848 F.2d 1036, 1039 (10th Cir.1988)). The court in *Jacoby* looked only at whether "whenever [the record maker] believed it necessary to explain something or make a record of an unusual circumstance, he prepared a memorandum to the file" to determine that the records in question met the standards of Rule 803(6), not at whether any other person would have made such a record, nor at whether it was an "industry-wide" practice to make such records, under the circumstances. *Jacoby,* 955 F.2d at 1537–38; *see also Phoenix Assocs. III,* 60 F.3d at 101 (looking only to the records of the particular business in question); *Variety Distrib.,* 927 F.2d at 248–49 (looking only to the keeping of records of the individual business in question and considering cases of refusals of custodians of records of individual businesses to lay a proper foundation for the records in an attempt to avoid self-incrimination as the result of the kinds and contents of entries kept in those records); *Fawaz,* 881 F.2d at 266 (principal of business testified that record was the kind he kept as a regular part of his business and the manner in which he filled it out, and court held adequate foundation had been laid); *Redken,* 843 F.2d at 229 (finding inadequate foundation under Rule 803(6) by looking at conduct of that particular business' record-keeping without reference to any general standard of the industry). The court concludes that the proper question under Rules 803(6) and (7) is not whether chiropractors in general keep records of referrals, but whether Allender did.

■ Allender has stated that he did not regularly enter into his records referrals to physicians. The next question the court must consider is whether Allender is qualified to state that his records would not regularly contain entries regarding referrals. It is not necessary that the person laying the foundation for the admissibility of business records have personal knowledge of their preparation. *United States v. Franks,* 939 F.2d 600, 602 (8th Cir.1991). However, in this case Allender certainly has that knowledge. Nor is it necessary that the person laying the foundation be the "custodian" of

the records; rather, under the rule, the person laying the foundation must be the "custodian" or some "other qualified witness." *Franks,* 939 F.2d at 602; *see also United States v. Console,* 13 F.3d 641, 656–57 (3d Cir.1993) ("Rule 803(6) does not require the foundation evidence for admission of a business record to be provided by the record's custodian," because some "other qualified witness" may provide such foundation), *cert. denied,* —— U.S. ——, 114 S.Ct. 1660, 128 L.Ed.2d 377 (1994).

The question is whether Allender was some "other qualified witness" rather than whether he was the "custodian" of the records. "Other qualified witness" may mean someone capable of testifying as to the nature of regularly kept records of the business, because that person is familiar with what is normally recorded and with the process whereby the records are created, recorded, and stored. *United States v. Kail,* 804 F.2d 441, 449 (8th Cir.1986); *United States v. Azure,* 801 F.2d 336, 342 (8th Cir. 1986) (physician, although not custodian of the records, could lay foundation where he "clearly knew the procedure used to transcribe his examination notes into reports"); *see also Phoenix Assocs. III,* 60 F.3d at 101 (person must be "sufficiently familiar with the business practice" to testify as to what records are normally kept by the business); *Console,* 13 F.3d at 641 ("qualified witness" must "understand[ ] the system" of recordkeeping); *United States v. Lawrence,* 934 F.2d 868, 871 (7th Cir.) ("The witness need only have knowledge [of the circumstances] under which the records were created"), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 323 (1991); *United States v. Dominguez,* 835 F.2d 694, 698 (7th Cir.1987) ("The witness need only be someone with knowledge of the procedure governing the creation and maintenance of the type of record sought to be admitted."); *United States v. Hathaway,* 798 F.2d 902 (6th Cir.1986) (FBI agent familiar with records was sufficient); *United States v. Moore,* 791 F.2d 566, 574 (7th Cir. 1986) ("qualified witness" is interpreted broadly to require only someone who understands the system used to record and maintain the information); *and compare United States v. Johnson,* 971 F.2d 562, 571 (10th

Cir.1992) (it is not necessary to call custodian of records or other qualified witness if a foundation for admissibility can "be predicated on judicial notice of the nature of the business and the nature of the records as observed by the court, particularly in the case of bank and similar statements"). Thus, because Allender was the person who created the records and was a person sufficiently familiar with the kinds of records kept by the business and how the records were maintained, he could properly state what information was regularly recorded in the records of his business.

Although Allender's characterization of what information is regularly recorded in the records of his practice might be subject to some concerns about trustworthiness, because Allender is a litigant in this matter, there were ways Allender's characterization could have been challenged. Brodersen could have deposed other custodians or "other qualified witnesses" concerning Allender's records or could have subpoenaed other records to determine whether Allender regularly, frequently, or ever recorded referrals to physicians in those records. Neither of these steps was taken here. Allender's characterization of his records therefore stands uncontroverted.

Although Brodersen asserts that Allender should have recorded referrals in his notes, he did not regularly do so. The "absence of entry" rule does not require that Allender's records meet some "industry-wide" standard for contents, only that Allender's records regularly contain such entries. Allender has stated that they do not. Thus, the absence of an entry regarding referral of Kendall to a physician is not admissible here to show that no referral was made.

The result of Brodersen's inability under the circumstances to rely on the "absence of entry" rule is that Brodersen has produced no evidence to generate a genuine issue of material fact as to whether or not Allender actually referred Kendall to a physician. Brodersen's assertion that had Kendall been told to go to a physician he would have mentioned that to someone else and would have gone to a physician sooner does not rise

to the standards for generation of a genuine issue of material fact in the absence of admissible "absence of entry" evidence based on Allender's records. *See Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510 (the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party."); *Allison,* 28 F.3d at 66 (same). Rather, Brodersen's "evidence" is instead nothing more than her rank speculation as to what Kendall might have done if informed by Allender to seek medical care from a medical doctor.[24]

Thus, Brodersen has not produced any admissible evidence which would generate a material fact question that Allender violated the appropriate standard of care. Therefore, summary judgment is appropriate here, and the court grants Allender's Third Motion for Summary Judgment.

## V. CONCLUSION

The court concludes that the Hospital's Motion for Summary Judgment is denied. First, the court finds that the material produced by Brodersen in the form of the affidavits of Dr. Phillips and Lorna Jahde raises a question as to whether a similarly situated patient who presents with chest pains would have been told to return to the emergency room nearly four hours later for x-rays without the benefit of an examination by a physician or the conducting of an EKG. The court concludes that Brodersen has produced sufficient evidence such that a reasonable jury could return a verdict for her. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Allison,* 28 F.3d at 66. Second, the court concludes that summary judgment is denied as to Brodersen's claim against the hospital that the hospital failed to stabilize him before releasing him. Although the court finds this to be an extremely close question given the evidence, caution requires allowing a jury to decide whether the Hospital did in fact determine that Kendall had an "emergency medical condition" at the time of his release. Third, the court concludes that a defendant's motive in failing to provide appropriate emergency treatment is irrelevant. *See Gatewood,* 933 F.2d at 1041; *Power,* 42 F.3d at 857–58. Accordingly, the court concludes that EMTALA should apply to any person denied sufficient emergency medical care regardless of the defendant's motive. Because Brodersen's EMTALA claim has not been dismissed, Defendant Frank Allender's First Motion for Summary Judgment is also denied since the court does have subject matter jurisdiction over him pursuant to 42 U.S.C. § 1395. Defendant Frank Allender's Third Motion for Summary Judgment is granted on the ground that, although the evidence produced by Brodersen here includes the testimony of three medical doctors, it does not include chiropractic testimony as to the standards of care of the chiropractic profession. This lack of testimony by a licensed chiropractor defeats Brodersen's malpractice case against Allender since none of the physicians admitted to any expertise or skill in the chiropractic field. Thus, none of the three physicians are qualified to testify as to the standard of care required of a chiropractor. The court further concludes that Brodersen has failed to generate a material fact question, concerning a violation of a chiropractic standard of care, as to whether Allender in fact referred Kendall to a medical doctor. The absence of an entry regarding referral of Kendall to a physician is not admissible here to show that no referral was made. Therefore, summary judgment is entered in favor of Defendant Allender and against Plaintiff on count III.

**IT IS SO ORDERED.**

---

24. There has been no suggestion, nor any evidentiary showing, by Brodersen that her testimony regarding what Kendall would have done rises to the level of habit, and therefore would be admissible under Federal Rule of Evidence 406.